## SCHWEITZER v. WALTON N. MOORE DRY GOODS CO.

Circuit Court of Appeals, Ninth Circuit.
April 1, 1929.

Rehearing Denied May 6, 1929.

No. 5584.

H. U. Brandenstein and R. A. Carter, both of San Francisco, Cal., for appellant.

T. T. C. Gregory and Wallace Sheehan, both of San Francisco, Cal., for appellee.

Before GILBERT and DIETRICH, Circuit Judges, and NORCROSS, District Judge.

DIETRICH, Circuit Judge. This action was brought by appellant to recover money alleged to be due under a written contract by the terms of which he became appellee's sales agent. At the close of his evidence, a motion for a nonsuit was granted, and from the judgment of dismissal he prosecutes this appeal.

Appellee is engaged in the wholesale merchandise business at San Francisco, and under the contract in question entered into on December 5, 1918, appellant agreed to proceed in its interests to the Orient to procure orders for merchandise, for a stated commission to be computed upon consummated sales. Appellee, however, guaranteed, and was to advance, compensation at the rate of $1,250 per month, together with all expenses of appellant and his assistant, for whose services he was to pay; the sums so advanced to appellant to be charged against, and deducted from, commissions computed at the contract rate. These advances were all made, and appellant concedes that, as understood by both parties, commissions were to be deemed earned only if and when the orders obtained by him were filled and fully paid for.

Pursuant to the agreement, he, with his assistant, went to the Orient, and in the spring of 1919 obtained an order from the Commercial Industrial Company at Vladivostok amounting to $168,589.04. In due course appellee shipped the merchandise to its own order at Vladivostok, with drafts drawn on the buyer for the amount of the purchase price and shipping documents attached. The industrial company accepted only a part of the shipment, and as the purchase price thereof paid a draft for $43,000. For his stipulated commission upon this amount appellant received due credit. Because of political and other local conditions we need not stop to explain, the industrial company failed to pay the other drafts and take over the balance of the merchandise. The goods remained in the customs' custody for some time at Vladivostok, until it became manifest that they could not be disposed of there; whereupon they were shipped by appellee to Shanghai, but its efforts to sell at that point were also unsuccessful. Subsequently they were returned to San Francisco, where they were sold at a loss of $56,752.53.

In the meantime, namely, on April 27, 1920, after it became apparent that the industrial company would be unable to complete its purchase, it entered into an agreement with appellee by which it turned over to it the net proceeds of a sale to be made by agents of the industrial company of furs owned by it, to protect appellee against any expense and losses it might incur as a consequence of the industrial company's inability to go on with its purchase. Under this agreement, appellee was to dispose of the undelivered goods to the best advantage possible and give a detailed account of sales. Any money left over from the net proceeds of the furs and the net proceeds of these sales, after covering appellee's loss resulting from the industrial company's failure to receive and pay for the entire merchandise shipment, was to be held for the credit of the latter. It was pursuant to this agreement that appellee acted in its efforts to sell and in finally making a sale as already explained.

With the resale appellant had nothing to do, for under his contract his employment ended with his return to San Francisco, which occurred in 1919.

As a result of litigation with the Pacific

Mail Steamship Company, appellee succeeded in recovering $54,000 as damages on account of the failure of that company to carry the merchandise from Shanghai to San Francisco within the time agreed upon. The several amounts thus received by appellee from the sources indicated aggregated a little less (between $2,500 and $3,000) than the industrial company should have paid had it accepted the goods and taken up the drafts in due course, and upon this aggregate amount appellant claims the commission in suit.

In the briefs there is much discussion of the question whether or not the agreement of April 27, 1920, together with the accounts set up by appellant pursuant thereto, operated to transfer to the industrial company title to the goods, and thus to consummate the "sale" thereof, but, in the view we take, the consideration is not controlling, and hence we do not attempt to analyze the reasoning advanced in support of the opposing contentions. Even were it assumed that, to avoid unnecessary peril and loss, the parties adopted a mode of procedure under which in form the industrial company was recognized as technically having the legal title, we are clearly of the opinion that the transaction as a whole was not within the terms of appellant's contract of employment. The contract contemplated actual commercial sales and payment of the purchase price pursuant to commercial usage. While appellant procured the order in question in the ordinary course, the sale contemplated thereby was never consummated; the purchaser was unable to make payment; and consequently delivery was never in fact made. In that emergency, to avoid controversy and unnecessary loss, the parties entered into a new understanding, which, though in a sense growing out of the order procured by appellant, was essentially different from that which the order implied, and the money realized by appellee came to it pursuant to this new agreement. Appellant's commission was to be computed upon money coming to appellee as the proximate result of his service, and his efforts did not constitute the procuring agency through which the amounts ultimately received by appellee were paid to it. Having engaged to pay appellant a commission only upon money received upon sales made and paid for in the usual course of commercial practice, the appellee cannot justly be held to a like obligation in respect to money it was able to collect only after extended efforts upon its own part and as the result of independent enterprise involving peril, labor, and expense. The case is not in substance different from what it would be had appellee, upon being advised that the industrial company was unable to take up the drafts, expressly asserted its right to withdraw the goods from the order and sued for and recovered damages as for breach of contract.

Affirmed.

NORCROSS, District Judge (dissenting). I am unable to agree with the view expressed in the prevailing opinion that the agreement of April 27, 1920, is not controlling. Neither the appellant, appellee, nor the Commercial Company, Limited, could be chargeable with foreseeing the political and other local conditions responsible for the failure of the latter company to accept and pay for the goods upon delivery, and it cannot be considered that the contract between appellant and appellee was entered into in view of any such contingency. When the goods arrived at Vladivostok, and the purchaser, by reason of changed political or other local conditions occurring since the time of agreement to purchase, was unable to pay for the same, the seller could pursue any one of four alternative remedies, conceded in the brief of counsel for appellee to be as follows:

"The alternative remedies of a seller for the breach of an agreement to buy personal property, not only under the California statute, but wherever the common law prevails, are:

"(1) Standing on the sale, the vendor may retain the property for the vendee and sue for the purchase price; or

"(2) Acting as the agent for the vendee, the vendor may resell the property and then sue to recover the difference between the contract price and the price obtained on the resale; or

"(3) The vendor may treat the property as its own, and recover from the vendee the difference between the contract price and the market price at the time and place of delivery."

In this case the seller adopted the second of the above-mentioned alternative remedies. It entered into a contract with the purchaser in pursuance of that remedy. The fact that it chose to retain possession of the goods and sell the same as the agent of the vendee as a means of procuring for itself the purchase price of the goods sold would not, in the event of the recovery of the purchase price, cut out the commission of the agent of the seller payable on receipt of such purchase price. Conceding that the contract be-

tween appellant and appellee contemplated actual commercial sales and payment of the purchase price pursuant to commercial usage, the method of procuring the purchase price in this case cannot be said to be contrary to commercial usage. If that usage is to be read into the contract between appellant and appellee, it should be read in its entirety.